Barr v. Essex Trades Council.

THOMAS C. BARR et al.

*v.*

THE ESSEX TRADES COUNCIL, THE TYPOGRAPHICAL UNION NO. 103, OF NEWARK, et al.

1. A person's business is property, entitled under the constitution to protection from unlawful interference. Every person has a right, as between his fellow-citizens and himself, to carry on his business, within legal limits, according to his own discretion and choice, with any means which are safe and healthful, and to employ therein such persons as he may select; and every other person is subject to the correlative duty arising therefrom, to refrain from any obstruction of the fullest exercise of this right, which can be made compatible with the exercise of similar rights by others.

2. Malicious injury to a person's business is actionable. An injury to the business of another is malicious and actionable if done intentionally and without legal excuse.

3 B, the proprietor of a daily newspaper, determined to use plate matter in the make-up of his paper, notwithstanding the interdictive resolution of the local typographical union, of which all his employes were, at the time, members. On this some of them left his employment, others remained, and, in consequence, lost their said membership. The union thereupon withdrew its endorsement of the paper, and reported the matter to the trades council, a representative association in which it and other trades unions were affiliated,

Barr *v.* Essex Trades Council.

the whole comprising a body of operatives in the county of Essex, of a purchasing capacity of $400,000 a week. After the publication, by each side, of its version of the difficulty, a circular was issued by the trades council calling on all friends to boycott the paper and to cease buying and advertising in it. A boycott of a newspaper started under these circumstances, in pursuance of which, not only the members of the various societies were, by their rules, but the public was, by the circular, which was widely distributed, called on to cease buying or advertising therein, and personal application was made to actual advertisers, by the distribution of printed circulars and resolutions of the societies, suggesting that they discontinue their advertising therein, even if they had made contracts to so advertise, enforced by a threat in the guise of a suggestion, that if they did continue to do so, they would also incur the enmity and opposition of organized labor, followed by damage to the proprietor of the paper, from loss in circulation and advertising, is an actionable wrong.

4. Even when there is a legal remedy, equity will interfere by injunction to prevent (1) an injury which threatens irreparable damage, and (2) a continuing injury, when the legal remedy therefor may involve a multiplicity of suits. The criterion of the application of this jurisdiction is the inadequacy of the legal remedy, depending on whether (1) the injury done or threatened is of such a nature that, when accomplished, the property cannot be restored to its original condition, or cannot be replaced by means of compensation in money; (2) whether full compensation for the entire wrong can be obtained without resort to a number of suits.

5. The facts in this case warrant the issuing of an injunction to restrain the defendants from certain acts which threaten a continuing injury and probable ruin of the complainants' business, the legal remedy for which is inadequate and would involve a number of suits.

----

On order to show cause why injunction should not issue.

*Mr. Anthony Q. Keasbey,* for the complainants.

*Mr. Joseph A. Beecher* and *Mr. Thomas S. Henry,* for the defendants.

GREEN, V. C.

The original complainant was the sole proprietor and publisher of a daily morning newspaper called the "Newark Times," printed and published in the city of Newark, in the county of Essex, in this state. After the order to show cause had been argued, another party, who had succeeded to an interest in the newspaper, was, on motion, admitted as a co-complainant in the

Barr v. Essex Trades Council.

suit. This action in no way affected the question presented, or the relative rights or liabilities of the original complainant and defendants in the premises, and as it will avoid confusion to treat the case without reference to the new complainant, this opinion will deal with it as presented on the argument on the pleadings, affidavits and agreed statement of facts.

The defendants are eighteen bodies, known as "labor unions," embracing many trades in the city of Newark, affiliated in a society or representative body known as "Essex Trades Council." Some of these unions, by the answer, deny having joined in the acts complained of, and the order to show cause must be discharged as to them, and they are not to be understood as embraced in the designation of "the defendants" as hereinafter used.

Although the pleadings, affidavits, exhibits and agreed statement of facts are very voluminous, the controlling facts with reference to the controversy between the parties and those I consider necessary for its determination lie within a much narrower compass and are practically undisputed. Stated as succinctly as possible, they are as follows:

The Laborers' Protective Union, No. 1, is incorporated; the others are not. Each union exercises an independent control over its own actions and proceedings, and is not under the general authority or power of the Essex Trades Council.

The Essex Trades Council is a voluntary association, composed of delegates or representatives chosen thereto by each of the eighteen defendant unions or associations. By its constitution, each bona fide labor organization of Essex county is entitled to send three delegates to the meetings of the council, with certain restrictions as to trade representation. Every organization becoming affiliated with the council is required to forward with the delegates representing it a set of credentials bearing the names, date of election and term of service of said delegates, under the seal of the organization. The officers consist of a recording secretary, a financial secretary, a corresponding secretary, a treasurer, three trustees, a sergeant-at-arms and standing committees. Meetings take place every Friday evening at eight

o'clock, the chairman of which is elected at the beginning of each meeting. Every organization represented in the council is required to make a monthly report of union purchases, and failing to do so for two consecutive months, its products are not to be considered as "fair."

The relative powers of this affiliated society and the unions as gathered from the answer, are that, while the said unions are connected with the said Essex Trades Council and are represented therein,

"the said council has no power, authority or control over the said eighteen defendants so as to make the said Essex Trades Council in any way responsible for the acts or proceedings of the said unions, or any or either of them, in connection with the matters complained of in the said bill."

Mr. Beckmeyer, who is the originator and secretary of the council, in his affidavit, says:

"One of the important features or methods of the work of the said council consists in organizing workmen, not only in their capacity as producers, but also as consumers, and showing to them superior advantages and benefits of organizing themselves, for the purpose of giving their custom to tradesmen and dealers who are willing to conform to the requirements which are deemed just and necessary by the said organization, for their mutual welfare and protection."

That,

"in pursuance of the said policy and methods, the said council has authorized and caused to be issued, from time to time, certain circulars, cards and other documents, educational in their character, and explanatory of its said plans, purposes and objects."

One of these, a circular, issued May, 1893, addressed to the public, states:

"The Essex Trades Council has for some time past been concentrating the trade of its members and those whom these could influence, upon the goods made and recommended by organized fair labor, and the stores and places where these goods are sold. The regular system of purchase reports from individual consumers, transmitted through their organization, places the council in a position to announce that it is already turning thousands of dollars of trade every week away from those indifferent to the welfare of the worker,

Barr v. Essex Trades Council.

and into the pockets of labor's proven friends. That these friends may receive greater support, by being made more readily known to organized workingmen and their many sympathizers among lovers of justice, together forming the great bulk of the consuming public, the Essex Trades Council will shortly issue a series of cards for free display in all business establishments especially deserving the patronage of organized fair consumers, their families, associates and friends."

The plan of operation, as developed by the papers and exhibits filed in the cause, is that each individual member of the different unions is required at stated periods to fill out a blank slip furnished for that purpose, stating the amount expended by him in purchase, the character of the articles bought, and the names of the tradesmen with whom he has dealt. These cards, when filled in, are returned by the members to their own union, and by the union reported to the council. A failure by a union to so report for two consecutive months, places its products under the ban of organized labor as represented in the council. These reports place the trades council in possession of data as to the amount of purchases by the members of the unions, and the tradesmen with whom their dealing is carried on, from which its officers are enabled to estimate, with some degree of accuracy, the volume of purchases by the members of the several organizations within a stated period of time.

The next step is an agreement in writing purporting to be made between the Essex Trades Council and a tradesman, by which the latter, "in return for the patronage of united fair consumers," promises and agrees to buy as consumer, engage as employer, keep as dealer, as exclusively as he can, such labor and goods as may be announced as fair by a particular union and endorsed by the council of consumers of the Essex Trades Council.

Cards are then issued to the tradesmen, under the seal of the trades council, addressed "to all fair consumers," each certifying that the person to whom it is issued "is a fair consuming dealer," and is entitled to their fraternal support until a specified date. Coupons are annexed for certification by particular industries. These cards are of such size, color and appearance that, if

publicly displayed in stores or places of business, they will attract attention.

There was issued, under date of March 31st, 1894, " by the Essex Trades Council and auxiliary circle bodies," a small pamphlet of convenient size to be carried in the pocket, which is entitled " The Fair List of Newark, N. J.," and to be " for the information of people who buy service or product and who have enterprise enough to seek to place their money where it will do them most good." It contains names and addresses of tradesmen and persons in business, including lawyers, interspersed with items of information and advice.

There is in the city of New York a business establishment whose object is to provide means to facilitate the publication of newspapers, by what is called " plate matter." This is reading news matter suited to the general needs of newspapers, supplemental to local items necessary for the several localities. This plate matter is edited and set up in New York in the ordinary way, as the bill alleges, by union printers ; it is then turned into stereotyped plates, which are delivered like ordinary merchandise to the publishers of newspapers for use in their daily or weekly editions.

It is said, without denial, to be a large business, and the matter is furnished to thousands of newspapers in different parts of the country, and is used throughout New Jersey, without any objections on the part of the typographical unions, except only in the city of Newark, and, possibly, Jersey City.

Mr. Barr, the complainant, as proprietor of the daily morning newspaper in Newark, determined to employ such plate matter in the make-up of his paper for publication. All his employes were members of the local typographical union. This union had declared against the use of plate matter in the city of Newark, which fact was known to Mr. Barr. Through his foreman, he sought to have this resolution of the union relaxed in favor of his paper, but on its refusal so to do adhered to his determination, and, by letter dated March 13th, 1894, informed his foreman that he would use plate matter on and after March 17th, saying further, that, not desiring to lose any of the men in his

department, the union scale of wages would be maintained, and that he would gladly retain the services of such as might be willing to stay.  Some of the employes determined to remain, others, however, left in consequence of his disregard of the union's determination, and the union withdrew its endorsement of the newspaper.  The union thereupon, through its delegates, informed the Essex Trades Council of this fact and requested its assistance.  In response, the council appointed a committee in reference to the controversy, and, on March 30th, 1894, issued a circular addressed to the public, which, after giving its version of the dispute, concludes with this appeal:

"Friends, one and all, leave this council-boycotting 'Newark Times' alone. Cease buying it!  Cease handling it!  Cease advertising in it!  Keep the money of fair men moving only among fair men.  Boycott the boycotter of organized fair labor."

This circular was distributed in the city of Newark.

In April, 1894, the trades council issued a small four-page sheet entitled "The Union Buyer.  Official bulletin of united fair custom of Newark and vicinity.  Issued by the Essex Trades Council."  It is impressed at the heading with the union label.  It purports to be volume I., number 1, issued at Newark, N. J., April, 1894.  Its first announcement is as follows:

"Our Mission—To support the supporters and boycott the boycotters of organized fair labor.  To promote the public welfare by the diffusion of common cents, urging all to carry these in trade only to those who will return them to the people in the shape of living wages."

The whole paper is devoted to the controversy between the unions and the "Newark Times," no other object being considered.  It refers throughout to that paper either by reversing the letters of the name "Times" as "Semit," or by turning the type bottom side up.  The first article after the declaration of its mission is a statement from Typographical Union No. 103, under the heading of "'The Times' Trouble."  The only grievance stated against the "Times" grows out of the use of plate matter, and ends with "workingmen and advertisers, remember that plate matter means forty-five cents a day, and

understand why the 'Newark Times' is an unfair office." Then
follow five columns of "Notes and Comments." These are all
directed to the controversy, and are in vigorous and denuncia-
tory language, and conclude as follows:

"In conclusion, the council desires to state that the issue between it and the
'Semit' is now wide open. It is a fight between the 'Semit' and its supporters
and the council and its supporters. We give the great public absolute free-
dom in the choice of its side, but not a single cent of our money will be know-
ingly let pass to anyone who buys the 'Semit,' keeps the 'Semit,' advertises in
the 'Semit,' or in any other way leads us to believe that a portion of our hon-
estly-earned money may find its way into the pockets to furnish support to the
unfair management of the 'Semit' or any of those who have so foully betrayed
the cause of organized fair labor."

At the foot of this document is placed, in large type, the
request, "When through reading, please pass to your neighbor."

This paper was circulated in Newark. There were other
publications, but the defendants deny any responsibility for
them, and there is no evidence to connect them with their issue
or circulation.

Various labor unions represented in the trades council then
passed a prepared set of resolutions, which were printed and
distributed in Newark. One of these requested all enterprising
business houses to abstain from advertising in the "Times"
until the trouble had been adjusted, stating that hundreds of
their friends had refused to buy and read the "Times," and that
its circulation had become considerably reduced because of its
alleged unfair stand. Another asked such advertisers as had
made contracts with the "Times" for definite periods, to con-
sider whether it would not be far more advantageous for them
in the end to take out their advertisements, leave their space
entirely blank and pay the few cents their contracts called for,
than to jeopardize thousands of dollars of trade that fair labor
would be "compelled to withhold so long as such advertisements
appeared, and for an indefinite period thereafter," adding that
"those who now continue to advertise in the 'Times' merely
succeed in making themselves conspicuous as persons to care-
fully and studiously keep away from."

These resolutions found their way into the hands of the advertisers in the "Times."

The bill alleges that, in consequence of the acts of the defendants, many of the dealers in and purchasers of complainant's paper and the advertisers therein have been intimidated from continuing to buy and advertise therein.

The various trades unions affiliated in the trades council, as is claimed by them, represent a purchasing power amounting to over $400,000 in each and every week. We have no information as to the aggregate number enrolled in these various organizations, but Mr. Beckmeyer states in his affidavit, that, by the mere announcement by the delegates of the typographical union to the trades council, that union had withdrawn its endorsement from the "Times," "in strict conformity with the lawful purposes and objects for which the said council was organized, all the organizations represented in the council, the individual members thereof and their friends and sympathizers did withhold their patronage from the said 'Newark Times' in a peaceable, quiet, orderly and lawful manner." The resolutions of the unions admit that thereby the circulation of the paper has been considerably reduced. That the distribution of the circular and copy of the resolutions adopted by the various unions has been effective and damaging, is also shown by the withdrawal of advertisements from the paper by Mr. Davis, Messrs. Spielman, Strack & Co., L. Bamberger & Co., and Hahne & Co. It is true that Mr. Byron, who was appointed by the trades council a member of a committee in regard to the controversy between the printers in the "Times" office and the proprietor, and the only member of the committee who acted as such, says that he saw these parties, but that at no time did he make any threat or intimidate or coerce any of the said advertisers or patrons of the "Times," nor did he "even personally solicit or request any of them to take any advertising or patronage from the paper;" but some person (whether Mr. Byron or whoever he may have been, can make no difference) left no less than four copies of the resolutions purporting to have been passed by four different organizations, with Mr. Davis, an advertiser, and some one also

left with other advertisers copies of the resolutions, and these resolutions expressly call upon persons to cease buying, handling or advertising in the "Times," and suggest that even if they have contracts for advertisements, it will be better for them to leave the space entirely blank than to prejudice the thousands of dollars of trade which labor will be compelled to withhold so long as their advertisements appear, and such advertisers did withdraw their patronage, giving as their reasons the receipt of these papers and the intimation contained therein. It is objected that this is hearsay evidence, but it was the declaration of the party made at the time of giving the order and in explanation thereof, and is competent in that connection.

It thus clearly appears that an injury to the complainant's business, in circulation and advertising, resulting from the acts of the defendants, comprising a large number of persons and associations acting in concert, has not only been inflicted but threatens to be continued. Is this illegal on the part of the defendants? Not in the sense of being criminal and punishable as such, for, in my judgment, the case does not, as seems to be assumed by some in similar cases, require an expression of opinion on that point, for two reasons—*first*, the jurisdiction of the criminal and civil remedies for acts, the result of a conspiracy, springs from different sources, for while the statute in the former now requires an overt act, at common law the act of conspiring constituted the crime; on the other hand, the injury done intentionally and without legal excuse, or maliciously, is the gist of the civil remedy; *second*, and as a consequence, while it is a short, proper and effective way to dispose of a claim of defendants that their act was in the exercise of a legal right, to show that it was criminal, the jurisdiction of this court to interfere by injunction cannot be based on any such conclusion, but must arise from conditions which involve well-established grounds of equity jurisdiction. When, therefore, the question is here asked if causing injury to the complainant's business is illegal it is meant, is it an actionable wrong? That is, has the complainant a remedy by civil action against the defendants therefor, or are the defendants privileged to do the acts charged in the manner

and under the circumstances complained of, even though the natural result thereof be an injury to complainant's business?

On the solution of this question depends the claim of the defendants that they have acted within their legal rights.

No unprejudiced person at this day wishes to place any obstacle in the way of labor organizations conducting their operations within lawful limits. It is unfortunate that, despite the warning and counsel of accredited leaders, the reckless and revengeful among the members, with the vicious and lawless always to be found among the idle, so often take advantage of labor demonstrations to commit acts of violence against persons and property, and thus weaken the sympathy of the public with the system. Yet everyone must acknowledge that organization has accomplished much in the past for the benefit of the workingman, and recognize its possibilities to secure to him, in the future, the enjoyment of other privileges. But while engaged in this laudable purpose, those who give direction to affairs should not attempt to secure their ends by infringing the lawful rights of others. When they are accused of so doing, it is the province of the courts, when the question is properly presented, to define and protect the rights of those brought within their jurisdiction. In discharging this duty, judges can only decide on established principles and rules, and are not empowered to create rights or initiate new powers or privileges. That is a legislative, not a judicial, function. It would seem to be unnecessary to state such elementary truths were it not that other views appear to be entertained by some.

The defendants claim, and they are entitled to be credited with being sincere in the contention, that they believe they have, in all matters complained of, acted strictly within the lines of their legal rights. This position justifies us in assuming that if they had not believed so, and had not been satisfied they were correct in law, the acts challenged would not have been committed, and, if now convinced they are wrong, will not again be attempted.

Are the defendants, then, privileged knowingly to inflict this injury on the complainant?    *8 Harv. Law Rev. 1.*

A man's business is property. By the first section of the bill of rights of the constitution of New Jersey, the right of acquiring, possessing and protecting property is classed, as a natural and inalienable right which all men have, with those of enjoying and defending life and liberty, and of pursuing and obtaining safety and happiness. This is an echo of *Magna Charta* repeated in the declaration of independence. Mr. Justice Bradley, in the *Slaughter House Cases, 16 Wall. 36* (at *p. 116*), says: "For the preservation, exercise and enjoyment of these rights [life, liberty and the pursuit of happiness] the individual citizen, as a necessity, must be left free to adopt such calling, profession or trade as may seem to him most conducive to that end. Without this right he cannot be a freeman. This right to choose one's calling is an essential part of that liberty which it is the object of the government to protect, *and a calling, when chosen, is a man's property and right.* Liberty and property are not protected where these rights are arbitrarily assailed."

Mr. Barr's business of publishing the paper with the incidents of its circulation and advertising, was as much his property as were the type and presses upon which the paper was printed. A harmful interference with the circulation and with the advertising in his paper, was, therefore, an injury to his property.

It was Mr. Barr's personal right, without interference or dictation from any person or persons, to employ, in the prosecution of his business, such mechanical appliances as were safe and healthful, and to employ, in the production of his paper, such persons and lawful means as he might choose.

It is said in *Hilton v. Eckersley, 6 El. & B. 47:* "It is the privilege of a trader in a free country, in all matters not contrary to law, to regulate his own mode of carrying it [his business] on according to his own discretion and choice."

Mr. Justice Beatty, in *Cœur D'Alene Coal Co. v. Miners' Union, 51 Fed. Rep. 260,* says: "Whatever enthusiasts may hope for, in this country every owner of property may work it as he will, by whom he pleases, at such wages and upon such terms as he can make; and every laborer may work or not, as he sees fit, for whom, and at such wages as he pleases; and

neither can dictate to the other how he shall use his own, whether of property, time or skill."

Sir William Earle, in his book entitled "The Law Relating to Trades Unions," which Lord Esher has said is a book more full of careful and accurate law than is to be found in many judgments (at *p. 13*), says: "These propositions assume that a person has a right to do as he chooses with his own, whether labor or capital, within the limits set by law; that a right involves a prohibition against the infringement thereof, and that a prohibition involves a remedy for the violation thereof."

At *p. 12*: "Every person has a right under the law, as between him and his fellow-subjects, to full freedom in disposing of his own labor or his own capital, according to his own will. It follows that every other person is subject to the correlative duty arising therefrom, and is prohibited from any obstruction of the fullest exercise of this right which can be made compatible with the exercise of similar rights by others. Every act causing an obstruction to another, in the exercise of the right, comprised within this description—done, not in the exercise of the actor's own right, but for the purpose of obstruction—would, if damage should be caused thereby to the party obstructed, be a violation of this prohibition; and the violation of this prohibition by a single person is a wrong, to be remedied either by action or indictment, as the case may be. It is equally wrong whether it be done by one or by many—subject to this observation, that a combination of many to do a wrong, in a matter where the public has an interest, is a substantive offence of conspiracy."

This freedom of business action lies at the foundation of all commercial and industrial enterprises—men are willing to embark capital, time and experience therein, because they can confidently assume that they will be able to control their affairs according to their own ideas, when the same are not in conflict with law. If this privilege is denied them, if the courts cannot protect them from interference by those who are not interested with them, if the management of business is to be taken from the owner and assumed by, it may be, irresponsible strangers, then we will have come to the time when capital will seek other

than industrial channels for investments, when enterprise and development will be crippled, when interstate railroads, canals and means of transportation will become dependent on the paternalism of the national government, and the factory and the workshop subject to the uncertain chances of co-operative systems.

The acts of the defendants directly infringe upon the exercise of this right by Mr. Barr. True, explicitly in words, they recognize the right and protest earnestly that they have no wish to interfere with him in the management of his business, with such means as he may select, but is it not perfectly apparent that the only purpose of the movement is to force him to abandon his determination to use plate matter in the make-up of his newspaper?

Certain members of Typographical Union No. 103, who were employes in his newspaper office, abandoned his employment. This they had a perfect right to do under the law. No man can be required to work for another unless he so desires, and it is his right, outside of contractual duties, to cease an employment which is distasteful to him, and, within the limit authorized by the statute of 1883, it is lawful for a number to combine to leave the service of their employer. If the defendants had stopped here, they would have been clearly within the exercise of their legal rights. But the members of the Typographical Union No. 103 were not content to stand on this right; they, through the Essex Trades Council, are affiliated with other unions and aggregate a body in a single county of this state which boasts (and I have no doubt truly) of a purchasing power of $400,000 a week. The bare declaration by the typographical union, that it no longer recognized the "Newark Times," was, according to Mr. Beckmeyer's affidavit, sufficient, under this perfect organization, to render it incumbent upon every member of these different unions to withhold his patronage from it. Not only this, but by the passage of the resolutions mentioned by the different unions, and the distribution thereof among advertisers, a moral intimidation was brought to bear upon the latter to further cripple the paper, either by wholly withdraw-

ing their advertisements or by leaving spaces, a most effective method of calling attention to the fact that the paper was under the ban of organized labor.

Why this action? It must have had a purpose. None of the different labor organizations or the members thereof, except the Typographical Union No. 103, had or has any grievance against the complainant. Their action, in the language of the times, was purely sympathetic. As to the typographical union, its members had no complaint against Mr. Barr, except that he used certain appliances which were not acceptable to the union. He paid the wages fixed by, and employed only members of, the union. The withdrawal of certain of the members from his employment was solely because he chose to use plate matter interdicted by the union, and it is plain, if the complainant would forego his own judgment in the management of his business in this regard, and comply with the wishes and determination of the typographical union with reference thereto, all matters being as they were, the whole difficulty would be at an end. To effect this purpose, therefore, the typographical union, through the trades council, enlisted the co-operation of the other organizations in an attempt to so impair the success of the newspaper that the complainant would be forced to accept the alternative proposed rather than sustain the loss.

We return to the question whether defendants' acts are actionable.

Malicious injury to the business of another has long been held to give a right of action to the injured party. *Garret* v. *Taylor, Cro. Jac. 567; Keeble* v. *Hickeringill, 11 East 574; Gunter* v. *Astor, 4 J. B. Moore 12; Lumley* v. *Gye, 2 El. & B. 216; Gregory* v. *Brunswick, 6 Man. & G. 205; Young* v. *Hichens, 6 Ad. & E. 606; Temperton* v. *Russell, L. R. 1 Q. B. 715 (1893); Carew* v. *Rutherford, 106 Mass. 1; Walker* v. *Cronin, 107 Mass. 555; Van Horn* v. *Van Horn, 23 Vr. 284; Lucke* v. *Clothing Cutters' and Tailors' Assembly, 19 L. R. A. 408; Curran* v. *Galen, 22 N. Y. Sup. 826; Bradley* v. *Pierson, 148 Pa. St. 502; Ryan* v. *Burger & Co., 13 N. Y. Sup. 660; Moores* v. *Bricklayers' Union, 23 Week. L. Bul. 48; 7 Corp.*

*L. J. 108; Delz* v. *Winfree, 80 Tex. 400; Olive* v. *Van Patten, 25 S. W. Rep. 426; Jackson* v. *Stanfield, 137 Ind. 592; Intr. Railroad Co.* v. *Greenwood, 2 Tex. Civ. App. 76; Chipley* v. *Atkinson, 23 Fla. 206; Haskins* v. *Royster, 70 N. C. 601; Bixby* v. *Dunlap, 56 N. H. 456; Mapstrick* v. *Ramge, 9 Neb. 390.*

In *Carew* v. *Rutherford, 106 Mass. 1,* Chief-Justice Chapman (at *p. 15*) says: "Freedom is the policy of this country. But freedom does not imply a right in one person, either alone or in combination with others, to disturb or annoy another, either directly or indirectly, in his lawful business or occupation, or to threaten him with annoyance or injury, for the sake of compelling him to buy his peace."

Mr. Justice Van Syckel, in *Van Horn* v. *Van Horn, 27 Vr. 318,* after reviewing the cases involving the recovery of damages in an action on the case as for a conspiracy (at *p. 523*), says: ".The rule to be deduced from these cases, and one which has the most ample support, is that, while a trader may lawfully engage in the sharpest competition with those in a like business by holding out extraordinary inducements, by representing his own wares to be better and cheaper than those of others, yet, when he oversteps that line and commits an act with the malicious intent of inflicting injury upon his rival's business, his conduct is illegal, and if damage results from it the injured party is entitled to redress. Nor does it matter whether the wrongdoer effects his object by persuasion or by false representation. The courts look through the instrumentality or means used to the wrong perpetrated with the malicious intent, and base the right of action upon that." The right of action depends, then, not so much upon the nature of the act as upon the intent with which it is done, always assuming that injury has attended the doing of it. Mr. Justice Taft, in *Toledo &c. Co.* v. *Penn Co., 54 Fed. Rep. 730,* with reference to a condition similar to that presented here (at *p. 738*), says: "Ordinarily, when such a combination of persons does not use violence, actual or threatened, to accomplish their purpose, it is difficult to point out with clearness the illegal means or end which makes the

.combination an unlawful conspiracy, for it is generally lawful for the combiners to withdraw their intercourse and its benefits from any person and to announce their intention of doing so, and it is equally lawful for the others, of their own motion, to do that which the combiners seek to compel them to do. Such .combinations are said to be unlawful conspiracies, though the .acts in themselves and considered singly are innocent, when the acts are done with malice, i. e., with the intention to injure another without lawful excuse." Citing many authorities.

In *Bowen* v. *Hall, 6 Q. B. Div. 333*, it is said: " If the per-suasion be used for the indirect purpose of injuring the plaintiff, or of benefiting the defendant at the expense of the plaintiff, it is a malicious act, which is in law and in fact a wrong act, and therefore a wrongful act, and therefore an actionable act if injury .ensues from it."

Lord-Justice Bowen, in *Mogul Steamship Co.* v. *McGregor, 23 Q. B. Div. 608:* " Now, intentionally to do that which is calculated in the ordinary course of events to damage, and which does in fact damage another in that other person's property or trade, is actionable if done without just cause or excuse. Such intentional action, when done without just cause or excuse, is. what the law calls a malicious wrong."

See, also, *Templeton* v. *Russell, supra.*

This renders necessary an inquiry as to the intent of the defendants to ascertain if the case falls within the class in which it is held that a malicious motive in the defendant may make an act which would not be wrongful without the malice, a wrongful act when done with malice. *Mogul Steamship Co.* v. *McGregor, 23 Q. B. Div. 596, 608.* From the authorities, the test is, has the injury been inflicted intentionally and without legal excuse?

When we speak in this connection of an act done with a mali-.cious motive, it does not necessarily imply that the defendants were actuated in their proceedings by spite or malice against the -complainant Mr. Barr, in the sense that their motive was to injure him personally, but that they desired to injure him in his business in order to force him not to do what he had a perfect

right to do.  *Templeton* v. *Russell, supra.*  In this case the de-
fendants have, I doubt not, no personal spite against Mr. Barr
individually, and no desire to do him a personal injury.  Nor
do I suppose they wish to permanently injure his enterprise, for
they undoubtedly want re-employment for those who left him.
They only wish, by crippling his business, to compel him to
accede to their views as to materials he shall use in the make-up
of his paper.  They in fact claim that they had no intention
to injure the business of the complainant, and that their only
desire was for the protection of themselves.  If the injury
which has been sustained or which is threatened is not only the
natural but the inevitable consequence of the defendants' acts, it
is without effect for them to disclaim the intention to injure.  It
is folly for a man who deliberately thrusts a firebrand into a
rick of hay to declare, after it has been destroyed, that he did
not intend to burn it.  If a person deliberately discharges a
loaded pistol, at point-blank range, directly at the person of
another, it is useless for him to say that he did not intend to
maim his victim.  The law, as a rule, presumes that a person
intends the natural result of his act; and this is true with refer-
ence to civil as well as criminal acts.  " Courts are bound to
look at things just as they are, to pass on facts just as they are
developed, to treat the conduct of men just as it is, and to
impute to them that intention which their acts and their conduct
disclose was their intention."  *United States* v. *Kane, 23 Fed.
Rep. 750.*

What other result than injury could ensue to the business of
the " Newark Times," published and circulated in Newark and
its vicinity, if organizations of individuals representing there a
purchasing power of $400,000 a week, each and every one not
only determined not to patronize the paper or to buy it, but by
resolutions passed in their various organizations call upon the
trading community to cease advertising in it, with implied
threats that the appearance of an advertisement by a tradesman
in the paper would be a warning to the members of the organ-
izations to avoid trading with such persons?  Loss of business
is the only natural result to be expected from such a condition.

of affairs, and if continued the failure of the enterprise would seem to be inevitable. That this is not an unfounded fear, we have it proved and admitted by the resolutions of the unions that the property of the complainant has already been injured by the acts of the defendants.

The next inquiry is, have the defendants a legal excuse for doing the acts which have occasioned and threaten further damage to the complainant's business?

They have set on foot and to a certain extent have made effective, not only by organized labor but by the public, a "boycott" of the complainant's newspaper. The circular issued by the trades council calls upon all friends of labor to "boycott" it— to cease buying, cease handling, cease advertising in it.

And herein this case differs from *Mayer* v. *Stone Cutters' Association, 2 Dick. Ch. Rep. 519*, so often referred to in the argument. While the bill in that case charged the defendants with the intention to boycott the complainant, there was no evidence to show any act committed or contemplated not fairly within the provisions of the act of 1883 (*Rev. Sup. p. 774 § 30*), which made it lawful "for any two or more persons to unite, combine or bind themselves, by oath, covenant, agreement, alliance or otherwise, to persuade, advise or encourage, by peaceable means, any person or persons to enter into any combination for or against leaving or entering into the employment of any person or persons or corporation." While it is entirely true, as is said in that opinion, that the policy of the law with reference to such combinations formed for the purposes specified in the act, namely, those whose object it is, by peaceable means, to persuade, advise or encourage persons to enter into a combination for or against leaving or entering into the employment of another, it left still subject to the inhibition of law every other illegal combination. It did not legalize a conspiracy to injure a man's business, to be effected by means other than those of a combination to enter into or leave his employment, and a combination to injure a man in his business by a concerted action on the part of an immense number of persons to cease dealing with him, and to persuade others to cease dealing with him, by threats to withdraw their

custom from them, for the purpose of obliging him to accede to their demands, or, in other words, to boycott him, has not been made lawful by the statute.

It is claimed by the affidavit of Mr. Beckmeyer that the term "boycott," as used in the circular and publications, has not the offensive signification sought to be placed upon it by the complainant's bill; "that it does not in any way mean, indicate or imply any threats, violence, intimidation or coercive action on the part of the said defendants, or any or either of them, or the members of any such organization; that such word has a technical meaning in the said labor organizations, and simply expresses and implies that the members of the said organizations should simply refrain from trading or dealing with those persons who oppose such organizations by their own actings and doings; that the use of the word is not intended, and does not, in fact, encourage, advise or urge in any manner, whether violent or otherwise, attacks upon or against the said newspaper or any person or business, but merely advises and encourages those who have earned their money by giving their services and labor, to spend such money amongst those who are friendly to fair trade and fair dealing, and are in sympathy with the efforts of organized labor to advance its own interests and welfare by peaceable, proper and lawful means, and not otherwise;" and further, "that of his own knowledge obtained from long intercourse and association with the various labor organizations, there is nothing in the use of the word 'boycott' calculated or intended to intimidate or incite violence, or induce to coercive measures, or indicate any threat, and that its meaning is universally understood in the said organizations to have no other or greater effect than above stated."

From which it is to be gathered that the use of the word "boycott" in the publications as applied to the "Times," would be regarded by the members of the various unions to mean only that they should refrain from trading or dealing with the complainant, and with those who oppose the organizations in their actions and doings with reference to the complainant.

I do not see that this changes the character of the injury, but

even if it does, so far as the members of the organizations are concerned, the difficulty is that these communications were addressed to the public and indiscriminately circulated. They were not intended only for members of the order by whom a technical signification would be given to the word "boycott," but to the general public who would read them and give the word its accepted meaning.

"Boycott" is defined, in the "Century Dictionary," as "an organized attempt to coerce a person or party into compliance with some demand, by combining to abstain, or compel others to abstain, from having any business or social relations with him or it; an organized persecution of a person or company, as a means of coercion or intimidation, or of retaliation for some act, or refusal to act in a particular way."

In *2 Am. & Eng. Encycl. L. p. 512*, quoting *Commonwealth* v. *Shelton, 11 Va. L. J. 329*, as "a conspiracy formed and intended directly or indirectly to prevent the carrying on of any lawful business, or to injure the business of anyone by wrongfully preventing those who would be customers from buying anything from or employing the representatives of said business, by threats, intimidation or other forcible means."

In "Anderson's Law Dictionary," "A combination between persons to suspend or discontinue dealings or patronage with another person or persons, because of refusal to comply with a request of him or them. The purpose is to constrain acquiescence or to force submission on the part of the individual, who, by non-compliance with the demand, has rendered himself obnoxious to the immediate parties and perhaps to their personal and fraternal associates."

In *Brace Brothers* v. *Evans, 3 R. & Corp. L. J. 561*, it is said: "The word in itself implies a threat. In popular acceptation it is an organized effort to exclude a person from business relations with others by persuasion, intimidation and other acts which tend to violence, and they coerce him, through fear of resulting injury, to submit to dictation in the management of his affairs."

Mr. Justice Taft, in *Toledo Co.* v. *Penn Co., 54 Fed. Rep. 746,*

says: "As usually understood, a boycott is a combination of many to cause a loss to one person by coercing others against their will, to withdraw from him their beneficial business intercourse, through threats that, unless those others do so, the many will cause similar loss to them."

But the defendants insist, and counsel vigorously urge, that this particular boycott is not open to such adverse criticism, because "there was no violence, intimidation, coercion or threats used, and that everything was done in a peaceful and orderly manner." How far is this claim borne out by the facts? It is true, there was no public disturbance, no physical injury, no direct threats of personal violence or of actual attack on or destruction of tangible property as a means of intimidation or coercion. Force and violence, however, while they may enter largely into the question in a criminal prosecution, are not necessary factors in the right to a civil remedy. But even in criminal law, I do not understand that intimidation, even when a statutory ingredient of crime, necessarily presupposes personal injury or the fear thereof. The clear weight of authority undoubtedly is that a man may be intimidated into doing, or refraining from doing, by fear of loss of business, property or reputation, as well as by dread of loss of life, or injury to health or limb; and the extent of this fear need not be abject, but only such as to overcome his judgment, or induce him not to do, or to do, that which otherwise he would have done or have left undone.

There can be no reasonable dispute that the whole proceeding or boycott in this controversy is to force Mr. Barr, by fear of loss of business, to conduct that business, not according to his own judgment, but in accordance with the determination of the typographical union, and, so far as he is concerned, it is an attempt to intimidate and coerce.

Next as to the members of the various labor unions. According to Mr. Beckmeyer, all the organizations represented in the trades council and the individual members thereof, in strict conformity with the purpose and object for which the said council was organized, withheld their patronage from the said news-

Barr v. Essex Trades Council.

paper on the mere announcement by the typographical union to the trades council that that union had withdrawn its endorsement from the "Times." Why? It is said that it was only the exercise by each person of his right to spend his money as his own will dictated. The fallacy of this is apparent. It loses sight of the combination, the whole strength of which lies in the fact that each individual has surrendered his own discretion and will to the direction of the accredited representative of all the organizations. He no longer uses his own judgment, but, by entering into the combination, agrees to be bound by its decree. As is said in *Templeton* v. *Russell, supra,* "those men had bound themselves to obey, and they knew they had done so, and that if they did not obey they would be fined or expelled from the union to which they belonged." It is common knowledge, if indeed it does not amply so appear by the papers in this case, that a member of a labor organization who does not submit to the edict of his union asserts his independence of judgment and action at the risk, if not the absolute sacrifice, of all association with his fellow-members. They will not eat, drink, live or work in his company. Branded by the peculiarly-offensive epithets adopted, he must exist ostracised, socially and industrially, so far as his former associates are concerned. Freedom of will under such circumstances cannot be expected.

Next as to the advertising public. Tradesmen advertise in newspapers for the sole purpose of drawing customers to their stores. An authoritative announcement, not from one, but from many sources, that the body of organized labor in the city or county representing a purchasing power of $400,000 a week would cease to deal with those whose advertisements appeared in the newspaper, would have a much more deterrent effect than any threat of violence. To say that this is only advice, or an intimation, to the advertiser for his guidance if he sees fit to accept it, is trifling with the language. Advice, behind which lurks the threat of the withdrawal of such a volume of business, could have no other effect than to intimidate and coerce, as it did in fact make several change their judgment, which had previously led them to advertise in the paper. The claim that this

boycott was attempted to be enforced without intimidation or coercion will not bear the light of examination.

A legal excuse for the action of the defendants is next sought in the claim that the Essex Trades Council is a business institution, and that what it has done has been in prosecution of such business, seeking, I suppose, to bring the case within the rule of *Mogul Steamship Co.* v. *McGregor*, *15 Q. B. Div. 476; 23 Q. B. Div. 598.* That case proceeded on the doctrine of a lawful competition in business, both parties being engaged in carrying on the same character of business, and the acts complained of having been adopted for the advancement of the defendant's own trade, viz., carrying goods on a steamship line, although thereby damage to the other party necessarily ensued.

I see no similarity in the business of these parties. That of the complainant is the publisher of a newspaper. Members of the typographical union and stereotypers' and pressmen's union are skilled workmen, whose services might be employed in such business, but they are not carrying on any enterprise in competition with that of the complainant. So far as the other unions are concerned, the most, if not all of them, have no connection with such trade.

Neither does the claim of the Essex Trades Council, that it is a business institution, stand on any firmer ground. The only element of business which it is engaged in would appear from the facts to be the furnishing to tradesmen of printed cards, certifying that they are proper persons for the members of trades unions to deal with, suitable to be displayed in conspicuous places in such tradesmen's places of business. This was supplemented by the issue, under date of March 31st, 1894, of the small pocket pamphlet entitled "The Fair List of Newark, N. J.," containing the names and addresses of tradesmen and persons in business in Newark, with items of information and advice. Why this is called a business does not appear. It is not stated that any compensation is either required or received by the trades council from the trades people for granting or continuing those endorsements, but whether this is so or not, it is in no sense a competing business with the publication of a daily

newspaper, and therefore does not come within the principle of the case referred to.

In the next place, counsel would seem to invoke the doctrine of *lex talionis,* claiming that the complainant has no standing in court to prosecute them for boycotting him, because he first boycotted the members of the Typographical Union No. 103. This is based on the assumption that Mr. Barr, knowing that the union had declared against the use of plate matter, and that by the rule of the union a member thereof could not retain his membership if he worked in an office which did not comply with the regulations of the union, by insisting upon and actually adopting the use of plate matter, in violation of such determination of the union, prevented members in regular standing, and who wished to retain their membership, from being employed by him. It will be remembered that Mr. Barr, in his letter of March, 1894, to his foreman, announcing his determination to use plate matter, distinctly stated that he did not desire thereby to have any of his employes quit their work, and that he would still maintain the union prices. If we accept the definition of the term " boycott," as technically understood in the organization, viz., to refrain from trading or dealing with persons who oppose us by their acts and deeds, there was nothing in Mr. Barr's action which could be characterized as a " boycott," and this is true when his acts are measured by the popular acceptation of the term.

Defendants frankly admit Mr. Barr's right to use plate matter in the conduct of his business, and that he has a right to manage such business in his own way, but by this insistment they claim that, unless he does prosecute that business in accordance with the determination of one of their bodies, he puts himself without the pale of the protection of the courts. The simple statement of the proposition carries along with it its own refutation.

It is next insisted, and on the same line, that complainant is excusable as to the distribution of the circular and resolutions, because they are retaliatory of similar acts on his part. The answer is drawn on such theory, and is direct and positive, and in this is supported by the affidavit of Mr. Beckmeyer, that

the publications of the defendants were inspired and made for the purpose of answering similar communications published in the paper by the complainant, he being the first aggressor, and in this way they seek to bring the case within the rule adopted by the general term of the supreme court of the first department of New York, in *Sinsheimer* v. *United Garment Workers, N. Y. L. J., April 26th, 1894.*

The present contention is entirely disposed of by the agreed state of facts, by which it appears that the first publication was March 26th, 1894, a statement of the dispute by the Typographical Union No. 103, charging Mr. Barr with having locked out all union men from his employ and filled his office with unfair workmen. This charge was denied the next day by complainant, under the signature of his foreman, followed in a later edition the same day by another card from the typographical union, and, on March 30th, by a denial of complainant's statement, through his foreman, and on the same day the circular was issued by the council, addressed to the public, by which it called upon all friends to cease buying, cease handling and cease advertising in the "Times," and to boycott it as a boycotter of organized fair labor.

It appearing that injury to the business of the complainant has been knowingly, without legal excuse, and therefore in law maliciously, inflicted by the defendants, it was an actionable wrong, for which the complainant is entitled to his remedy, and that brings us to the question raised by the answer, and most strongly insisted upon by counsel in the argument, as to whether this court has jurisdiction to grant relief by way of injunction.

Even when there is a legal remedy, equity will interfere by injunction to prevent (1) an injury which threatens irreparable damage, or (2) a continuing injury when the legal remedy therefor may involve a multiplicity of suits. This jurisdiction is established and unquestionable. In practice, the criterion of its application is the inadequacy of the legal remedy, depending on whether (1) "the injury done or threatened is of such a nature that, when accomplished, the property cannot be restored to its original condition, or cannot be replaced by means of compen-

Barr *v.* Essex Trades Council.

sation in money;" (2) whether full compensation for the entire wrong can be obtained without resort to a number of suits. *3 Pom. Eq. Jur.* §§ *1338, 1346, 1357.* The difficulty of satisfactorily estimating damages to business is frequently recognized in applying those principles to suits relating to good-will, trademarks, patent-rights and copyrights. *3 Pom. Eq. Jur.* §§ *1352, 1354.*

The complainant's paper is published daily. While no one has a right to be hedged in and protected from competition in business, everyone is entitled to a chance for the patronage of the public, uninfluenced by malicious interference to excite prejudice. "A right to require that the course of trade should be kept free from unreasonable obstruction." *Earle Tr. Un. 6.* Representations calculated to reduce the paper's circulation with the public, or to influence, by fear of loss of customers, the number or extent of advertisements, operate, not once for all, but, as it were, day by day as the paper goes to and comes from the press, and each loss will be a distinctive cause of action.

No more vulnerable object could be presented for the operation of a boycott than the advertising columns of a newspaper. They bear on their face the only information necessary as to the salient points of attack. To successfully appeal to a legal tribunal for redress for such injury as is here shown would involve either waiting until all the damage was done or the bringing of innumerable suits successively as the damage was ascertainable. While the combination of the defendants does not constitute complainant's right of action to recover redress for injury inflicted on his business, it has great bearing on the extent of the damage thereto which may be threatened by defendants' conduct. There would be no difficulty for complainant to successfully defend his enterprise from the attacks of one or more individuals. This is the common expectation of every one who embarks in any business. But when opposition through the agency of already-established organizations, reaching in their locality every part of the county, and in their membership almost every industry in prominent operation—comprising in the territory in which the paper must look for its support, operatives of a purchasing

power of $400,000 a week, is put on foot—when such an organization, not satisfied with its potential authority over its own members, appeals to the public to boycott the paper, to cease buying or advertising in it, with the significant suggestion that disregard of the appeal will bring upon such person the like opposition of the organizations—who can estimate or approximate the natural damage short of ruin? The legal remedy in this case thus not only involves multiplicity of suits, but the threatened damage seems irreparable.

Authority is not wanting that a court of equity will enjoin a boycott. Being itself a proceeding of modern origin, of course no cases are to be found until recent years. The curious will find an interesting account of the circumstances in which the use of the words originated in Mr. Justin H. McCarthy's "England under Gladstone," and an article suggesting that the method had its inspiration in the proceedings of excommunication practiced in ecclesiastical tribunals, in *19 Ir. L. T. 572.*

A case so much in point that counsel were forced to take the position that it should not be followed in this state, is *Casey* v. *Cincinnati Typographical Union, No. 3,* reported in *45 Fed. Rep. 135.* The contention of counsel is that the policy of the law in New Jersey has been changed by legislative action, and the statutes with reference to conspiracies (*Rev. Sup. p. 774 § 30*) and with reference to the publication of the laws (*P. L. of 1887 p. 260 § 5*) are referred to. I have already considered the bearing of the first-named act. The other act contains a provision that the money of the state is not to be paid to the proprietor of a newspaper which prints the laws from plates, unless such plates are cast in its own office for its own use. It is claimed, and no doubt correctly, that this act is aimed at the use of the very plate matter which has been the cause of complaint in this controversy, and it is insisted that it is declaratory that the policy of the law in this state is against the use of plate matter. It is, however, unfortunate for the position that while the provision was retained in the act of 1889 (*P. L. of 1889 p. 462*) it was omitted from the act of 1894 (*P. L. of 1894 p. 529*), which repeals all former laws. But the

answer to the contention is plain, viz., the statute only altered the law so far as the provisions thereof extended, viz., the payment for the publication of the laws, and if the case challenged as authority is founded on accepted principles of equity jurisprudence, it is to be recognized and followed here.   The case was this :

The complainant, Casey, was the proprietor and publisher of "The Commonwealth," a daily and weekly newspaper published at Covington, Kentucky, and brought the suit to restrain the defendant, a corporation organized under the laws of Ohio as a trades union, from boycotting the complainant and his newspaper.   It appeared that the defendant demanded that complainant should unionize his office and pay his employes wages at the rate fixed by the union, and discharge from his employment persons not members thereof.   The bill averred that, on complainant's refusal to comply with these demands, defendants illegally and unlawfully, and with intent to injure the complainant and to destroy the circulation of his paper and its value as an advertising medium, conspired and combined to boycott him and his paper, and to that end caused to be printed and posted in conspicuous places large handbills, calling upon all persons to withdraw their patronage from complainant's paper, and issued circulars signed by the union and addressed to advertising patrons of complainant, requesting them to withdraw their advertisements from his said paper, threatening that upon failure to do so, they would be visited with the ill-will and incur the enmity of all organized labor, and that they would induce all members of labor associations to withdraw all patronage from them.   It also averred that the union sent circulars to the news agents, threatening that, unless they ceased selling said paper, they would in like manner lose the patronage of and be antagonized by the members of all labor organizations.   The case is so similar in its facts and defences to this, that I feel warranted in quoting liberally from the opinion.

Mr. Justice Sage, after stating the facts and referring to the cases of *Kidd* v. *Horry, 28 Fed. Rep. 773*, and others which hold that an injunction will not issue to enjoin the publication

Barr v. Essex Trades Council.

of a libel, and some others, says: "The question with which we have to deal is whether this case falls within the rule [of those cases]. That the defendant, the typographical union, set on foot a boycott against the complainant, as stated in the bill and in the affidavits on file, is not denied. That this boycott was to be enforced by threatening loss of business to those who, having no connection with the union, should continue to advertise with, or in any way patronize, the complainant, is clearly shown. True, it is claimed that no threats were used, but the language of the circulars has no doubtful meaning. The affidavits on file show that it was perfectly understood by those who received them, and the circumstances indicate that it was intended that it should be so understood. In *Brace* v. *Evans, 3 Ry. & Corp. L. J. 561,* it was held that the word 'boycott' is in itself a threat. 'In popular acceptation it is an organized effort to exclude a person from business relations with others by persuasion, intimidation and other acts which tend to violence, and thereby coerce him, through fear of resulting injury, to submit to dictation in the management of his affairs.' But it is insisted for the defendants that every representation of fact contained in the handbills and circulars is true—that is to say, that the complainant had, in 1888, broken with the typographical union, discharged all union employes and had since that date employed only those who were not members of the union; and that after repeatedly promising to unionize his office, he had finally, in September, 1890, refused to do so, and declared that he would not employ any person who was connected with the union. All these are conceded facts. Therefore, argue counsel for the defendants, this is only a case of lawful competition. The complainant having declared that he would not employ any member of the union, the union had a right to say that its members would not patronize the complainant. Nobody disputes that proposition. If that were all that is involved in this case, there would be nothing for the court to act upon. But it is not all, by any means. Instead of 'fair, although sharp and bitter, competition,' as is contended by counsel, it was an attempt, by coercion, to destroy all competition affecting the union. It was

an organized conspiracy to force the complainant to yield his right to select his own workmen, and submit himself to the control of the union, and allow it to regulate prices for him, and to determine whom he should employ and whom discharge. In other words, it was and is an organized effort to force printers to come into the union or be driven from their calling for want of employment, and to make the destruction of the complainant's business a penalty for his refusal to surrender to the union. Whatever moral obligations may have been incurred by the complainant by reason of his promises to unionize his office, they were wholly without consideration, and they amount to nothing whatever in law or in equity. No cases have been cited where, upon a proper showing of facts, an unsuccessful appeal has been made to a court of chancery to restrain a boycott. The authorities are all the other way."

The learned justice then refers to several cases and concludes as follows: "In the light of these authorities, it is idle to talk about the defendants' acts and publications as mere incidents of a competition set on foot by complainant's declaration that he would not employ union printers; that the publications are shielded by constitutional guaranties; or that, viewed in the most unfavorable light, they are nothing more than libels, and the only remedy for any injury resulting is by an action of law." The motion for a temporary injunction, to continue in force until the final decree, was granted.

*Brace Brothers* v. *Evans*, in Allegheny common pleas, reported in *3 Ry. & Corp. L. J. 561* and *35 Pittsb. L. J. 399*, and followed in *Murdock* v. *Walker*, which was affirmed, on the opinion of the lower court, by the supreme court of Pennsylvania, *152 Pa. St. 595*, is an exceedingly well-considered case. It was this: The plaintiffs had a long-established and flourishing laundry business. They had a plant operated by steam and employed some one hundred and thirty-five hands, ninety of whom were girls. Their custom was drawn from the cities of Pittsburg and Allegheny and neighboring towns. They employed thirteen agents, who collected clothing &c. from the patrons and delivered it by wagons and teams driven by per-

sons employed by the plaintiffs. A difference arose between the plaintiffs and some of their employes, when they discharged eleven of the girls, who afterwards persuaded some others to leave their employment. Plaintiffs were afterwards visited by persons representing themselves to be connected with the knights of labor and trades assembly, who demanded that the girls who had left should be reinstated, saying, if they were not, it would be to the injury, if not the ruin, of plaintiffs' business. Shortly afterwards, circulars were issued, giving what purported to be a history of the difficulty, and asking all persons to cease patronizing plaintiffs. This was followed by others of similar import, on some of which there was printed, in large letters, "Boycott. Brace Bros." Men followed plaintiffs' wagons, took down the names of their customers, and afterwards visited them and endeavored to persuade them from further patronizing plaintiffs. A sign was placed on a building in Pittsburg, having on it, in large letters, "Headquarters Brace Bros. Boycott Committee." Men in buggies, having banners on each side, on which was printed "Boycott Brace Bros.," followed the plaintiffs' wagons. Often, crowds of men and boys followed, shouting after the drivers. Persons visited plaintiffs' agents and requested them to cease acting as such, and on their refusal so to do, circulars were issued denouncing them and asking the public to boycott them. Men were posted in front of their places of business, who distributed circulars in large numbers, whereby large and noisy crowds were collected. All the agents of plaintiffs except one declined to further represent them. Many of their customers withdrew their patronage, giving as a reason, the demonstrations against the plaintiffs. The weekly loss of business was shown to be considerable. The boycott was continued, notwithstanding the prosecution of suits to recover damages, when this suit was brought for an injunction. Mr. Justice Slagle, after an exhaustive review of the authorities, decided that an injunction should issue on the ground that the injury was irreparable, as there was no adequate remedy at law, and that the remedy at law would involve a multiplicity of suits.

*Emack* v. *Kane, 34 Fed. Rep. 51,* was a suit to restrain de-

:fendants from carrying into effect a malicious intent to injure :and destroy complainant's business, by intimidating persons from dealing with him, by threatening in circulars to bring suits .against them for infringement of patents. Mr. Justice Blodgett, .granting an injunction, among other things says: " True, it may be said that the injured party has a remedy at law, but that might imply a multiplicity of suits, which equity often interposes to relieve from. But the still more cogent reason seems to be that a court of equity can, by its writ of injunction, restrain .a wrongdoer, and thus prevent injuries which could not be fully redressed by a verdict and judgment for damages at law. Redress for a mere personal slander or libel may, perhaps, properly be left to the courts of law, because no falsehood, however gross :and malicious, can wholly destroy a man's reputation with those who know him, but statements and charges intended to frighten :away a man's customers and intimidate them from dealing with him, may wholly break up and ruin him financially, with no .adequate remedy if a court of equity cannot afford protection by its restraining writ."

*Cœur D'Alene Consolidated Mining Co.* v. *Miners' Union, 51 Fed. Rep. 260,* was a suit, among other things, to restrain the ·defendants from interfering with or preventing complainants' employes from working upon its mines, by the use of force, threats ·or intimidations, or by other means. A motion to dissolve a temporary injunction was denied. Mr. Justice Beatty refers to the ·distinction between suits to enjoin the publication of a libel and one to restrain acts to intimidate persons from dealing with :another, as follows: "A clear distinction will be observed between the two classes of cases above noted. In the one, when ·the acts complained of consist of such misrepresentations of a business that they tend to its injury and damage to its proprietor, the offence is simply a libel, and in this country the courts have, with great unanimity, held that they will not interfere by injunction, but that the injured party must rely upon his remedy :at law. On the contrary, when the attempt to injure consists of :acts or words which will operate to intimidate and prevent the ·customers of a party from dealing with, or laborers from work-

Barr v. Essex Trades Council.

ing for, him, the courts have, with nearly equal unanimity, inter-posed by injunction. In the one case, it is an injury to a man's business by libeling it; in the other, by force, threats and other like means, he is prevented from pursuing it; and, while the damage might be as great in the one case as in the other—but most likely with different consequences to the good order and peace of the community—the courts have determined upon dif-ferent remedies. What constitute such actionable threats or intimidations must be determined in each case from all the circumstances attending it. If the things done or the words spoken are such that they will excite fear or a reasonable appre-hension of damages, and so influence those for whom designed as to prevent them from freely doing what they desire, and the law permits, they may be restrained, and the courts will look beyond the mere letter of the act or word into its spirit and intent."

*Blindell* v. *Hogan, 54 Fed. Rep. 40, affirmed on appeal, 56 Fed. Rep. 696*, was a suit to enjoin further interference with com-plainants in their business as shippers. Mr. Justice Billings says: "The foundation of this jurisdiction of equity is the probability of irreparable mischief, the inadequacy of a pecuniary compensation, and the prevention of a multiplicity of suits. *Fonb. Eq: by Lausat, p. 3:*

"'When there is a large combination of persons to interfere with a party's business by violence, the equity jurisdiction, if maintainable at all, is main-tainable on either of two grounds—the nature of the injury, including the dif-ficulty of establishing, in a suit at law, the amount of actual damage sustained, or the prevention of a multiplicity of suits.'"

After referring to several cases, he continues, quoting from *Osborn* v. *Bank, 9 Wheat. 845:* "In these cases, the injured party would have his remedy at law; * * * but it is in the power of a court of equity in such cases to arrest the injury and prevent the wrong. The remedy is more beneficial and complete than the law can give."

In *Toledo, A. A. & New Mexico Railway Co.* v. *Pennsylvania Coal Co. et al., 54 Fed. Rep. 730; S. C., 19 L. R. A. & E. 387,* Mr. Justice Taft, after a review of the cases, says: "When an

Barr v. Essex Trades Council.

irreparable and continuing injury is threatened to private property and business rights, equity will generally enjoin on behalf of the person whose rights are to be invaded, even though an indictment on behalf of the public will also lie."

In *Jackson* v. *Stanfield, 137 Ind. 592*, in the supreme court of Indiana, on appeal from the circuit court of St. Joseph county, the case was this: "The Retail Lumber Dealers' Association," by its by-laws, gave an active member a claim against a wholesaler for selling to a person not a "regular dealer" in such member's community, provided for a hearing of the claim by a committee, and required members to refuse to patronize a wholesaler who ignored the committee's decision. Plaintiff, who was not a "regular dealer," underbid defendant on a contract, but wholesalers refused to sell to him, and he was obliged to abandon the contract, because defendant, an active member of the association, had previously enforced a claim against a wholesaler who had sold to plaintiff, and expressed an intention of continuing to enforce such claims. Suit was for damages and an injunction, and judgment in the circuit was for defendants. On appeal, this was reversed, and judgment directed to be entered for plaintiffs for the damages found, "and with the further instruction to render a judgment perpetually enjoining the defendants from in any way, other than fair, open competition, interfering with the plaintiffs in their business, and from demanding a penalty or making a claim against anyone under the by-laws of the association who may sell to the plaintiffs or through them to a consumer."

In *Sherry* v. *Perkins, 147 Mass. 212*, a boycott was being made effective by parties parading up and down in front of plaintiff's place of business with banners, advising workmen to keep away, an injunction was granted, the court saying: "The wrong is not, as argued by the defendant's counsel, a libel upon the plaintiff's business. It is not found that the inscriptions upon the banner were false, nor do they appear to have been in disparagement of the plaintiff's business. The scheme, in pursuance of which the banners were displayed or maintained, was to injure plaintiff's business, not by defaming it to the public,

Barr v. Essex Trades Council.

but by intimidating workmen so as to deter them from keeping or making engagements with the plaintiff. The banner was a standing menace to all who were or wished to be in the employment of the plaintiff, to deter them from entering the plaintiff's premises, maintaining it was a continuous unlawful act, injurious to plaintiff's business and property, and was a nuisance such as a court of equity will grant relief against."

*Olive* v. *Van Patten, 25 S. W. Rep. 428:* A petition alleging that defendants (wholesale lumber dealers) formed an association, agreeing not to sell to others than dealers; that, because of the refusal by the plaintiff (another dealer) to join such association, they had maliciously distributed circulars, asking that patronage be withdrawn from the plaintiff till he agreed not to sell to others than dealers, thereby influencing others not to deal with plaintiff, to his injury—*held,* to state a good cause of action for damages and injunction.

Since the foregoing was prepared, my attention has been called to the instructive opinion of Mr. Justice Taft, in the case of *Thomas* v. *Cincinnati, O. & T. R. Railway Co., Re Phelan, 62 Fed. Rep. 803,* in support of some of the positions taken herein.

The order to show cause, so far as relates to the Cigar Makers' Union, No. 117, Orange; the Clothing Cutters' Assembly, No. 6224, K. of L.; the German Typographical Union, No. 8; the Clothing Salesmen's Association; the Bag Makers' Union; the Musical Protective Union; the National Brewers' Union and the Malsters' Union, they having all disclaimed any participation in the acts complained of, must be discharged, with costs. The said order to show cause, so far as relates to the other defendants, must be made absolute, with costs, and an injunction may issue against them, restraining them from distributing or circulating any circulars, printed resolutions, bulletins or other publications containing appeals or threats against the "Newark Times," or the complainants, its publishers, with the design and tending to interfere with their business in publishing said paper, and from making any threats or using any intimidation to the dealers or advertisers in such newspaper tending to cause them to withdraw their business from such newspaper.